UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA COFFMAN, et al.,<br><br>Defendants. | No. 2:08-cr-0093-KJM<br><br><br><br>ORDER |

    Defendant Joshua Coffman was part of a multi-member fraudulent real estate scheme that cost homeowners millions. In September 2013, Coffman pled guilty to mail fraud and conspiracy to commit mail fraud. Plea Hr'g Mins., ECF No. 850. In his plea agreement, Coffman admitted the conspiracy cost homeowners between $2.5 million and $7 million in equity, and he agreed to a restitution estimate between these figures. Plea Agreement ("Plea Agmt."), ECF No. 851, at 2-3. The question before this court is how much restitution Coffman independently owes. The government seeks a $7,973,923.51 restitution award; Coffman requests an award of $1,216,979.29. Coffman Br., ECF No. 1443, at 1; Gov't Mem., ECF No. 1444, at 6. Having carefully reviewed the parties' filings and exhibits, the court ORDERS Coffman to pay $7,364,387.04 in restitution, as explained below.

/////

/////

1

I. BACKGROUND

The fraudulent scheme underlying Coffman's conviction has been detailed at length in prior orders. The facts here are limited to Coffman's individual involvement to the extent it relates to the restitution he owes.

The government charged Coffman and fifteen codefendants[1] in February 2008 with conspiracy to commit mail fraud, mail fraud and conspiracy to commit money laundering. ECF No. 1. In his September 2013 plea agreement, Coffman agreed to pay restitution to "all victims affected by . . . [his] conduct from the period of approximately January 1, 2004 to March 14, 2006." Plea Agmt. at 2-3. The plea agreement's factual basis, which Coffman admitted during the sworn colloquy at his change-of-plea hearing, memorializes his involvement. Documents attached to the government's restitution brief, to which Coffman has not objected, augment the factual basis. *See generally* Exs. 1-59, attached to ECF No. 1444 (interview notes, officer memoranda, and transcripts). The court has relied on similar evidence in fashioning other defendants' restitution orders. *See, e.g.*, ECF No. 1405 (restitution order for Andrew Vu). To the extent Coffman has not objected to facts contained in his pre-sentence report ("PSR"), the court may rely on those facts here as well. *United States v. Barton*, 366 F.3d 1160, 1166 (10th Cir. 2004) (citation omitted); *see also* Coffman PSR, ECF No. 1017 (sealed).

A. The Conspiracy

Coffman was one of the first to join the conspiracy. Ex. 1, ECF No. 1444-1; Ex. 2, ECF No. 1441-2. He started working for Charles Head's loan origination company in 2003, just before the company turned to carrying out its fraudulent foreclosure scheme. *See* Exs. 1-2. The fraudulent scheme transpired as follows: Individual codefendants mass mailed bulk-purchased postcards to distressed homeowners; each coconspirator then used a script designed by Charles

---

[1] Co-defendants Charles and Jeremy Head led two conspiracies to defraud homeowners. Both conspiracies use similar methods, but they sufficiently differed in scope, membership, and approach such that the government charged them as separate cases. Accordingly, they are referred to as the "Head I" and "Head II" conspiracies. Coffman is indicted as part of the "Head I" conspiracy, along with Jeremy Head, Charles Head, Justin Wiley, Andrew Vu, Elham Assadi, Leonard Bernot, Akemi Bottari, John Corcoran, Sarah Mattson, Domonic McCarns, Anh Nguyen, Omar Sandoval, Xochitl Sandoval, Eduardo Vanegas, and Kou Yang. Indictment, ECF No. 1.

Head to persuade homeowners to sign financial and property documents, while falsely assuring the homeowners their names would remain on the title. *See* Ex. 2 (Coffman admitting scheme designed to make homeowners believe they were just refinancing their homes and their names would remain on title when, in fact, their names were removed). Consequently, homeowners lost their homes and millions in equity. *See generally* ECF No. 1444 (59 exhibits attached to government's sentencing memorandum detailing victim losses). Coffman remained actively involved in the scheme until September 2005. *See* Ex. 59, ECF No. 1444-16, at 13-17 (financial documents pertaining to final victim, L.A., who reportedly lost equity during this month due to Coffman's participation). In July 2006, Coffman still had not restored their homes to some victims. *See* Ex. 2; Plea Agmt. at 9. The factual basis supporting Coffman's plea does not identify all homeowner victims by name, but does identify the general number of victims, how they were defrauded, and Coffman's specific involvement in the fraudulent scheme, including examples of Coffman's fraudulent methods. Plea Agmt. at 12-13.

B. <u>Relevant Procedural History</u>

Coffman has not agreed to a specific restitution sum, but as noted, as part of his plea deal, he agreed to "pay the full amount of restitution to all victims affected by this offense . . . as a result of [his] conduct" with a range estimated between $2.5 and $7 million. Plea Agmt. at 2-3. The government's request for restitution in the amount of $7.9 million exceeds this estimated range. Gov't Mem. at 1. Coffman contends this sum far outweighs his level of culpability or involvement and exceeds the sums imposed on several similarly situated coconspirators. Coffman Br. at 2. He requests an order to pay $1,216,979.29, an amount significantly less than the parties' estimated range. Coffman Br. at 1. Coffman further contends, as discussed more below, that the government has breached the agreement by now requesting a higher sum. Coffman Reply, ECF No. 1452, at 3 n.3.

The government's initial sentencing memorandum in this case requested a restitution order holding Coffman, Wiley and Bottari jointly and severally liable for $7.9 million. Gov't Mem. at 1. Since then, the government and Wiley stipulated to a $3,501,750.69 restitution award (Stipulation, ECF No. 1464; Judgment, ECF No. 1495); the government and Bottari

stipulated to a $3,129,104.89 restitution award (Stipulation, ECF No. 1463; Judgment, ECF No. 392).[2] The court ordered the government to show cause why Coffman's restitution order should not be resolved with reference to an equivalent amount. Min. Order, ECF No. 1555. The government responded, ECF No. 1159, and Coffman replied, ECF No. 1564. With the record now closed, the court independently assesses restitution as to Coffman based on that record, including Coffman's incriminating factual admissions and incriminating financial documents. *See generally* ECF No. 1444.

II. <u>LEGAL STANDARD</u>

The Mandatory Victim Restitution Act ("MVRA") requires the court to order "in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ," 18 U.S.C. § 3663A(a)(1), when the offense is one "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," *id.* § 3663A(c)(1)(B). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* § 3663A(a)(2). "[I]n a case involving a conspiracy or scheme, restitution may be ordered for all persons harmed by the entire scheme" and is "not confined to the harm caused by the particular offenses to which [defendant] pleaded guilty" because "[a] conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy." *United States v. Riley*, 335 F.3d 919, 932 (9th Cir. 2003) (citation omitted). Restitution is, however, limited to harm "closely related to the

---

[2] Restitution as to all other "Head I" coconspirators has already been ordered: $16,057,668.54 as to John Corcoran (ECF No. 1375); $9,534,240.21 as to Charles Head (ECF No. 1191); $8,236,871 as to Jeremy Head (ECF No. 1514); $16,057,668.54 as to Kou Yang (ECF No. 1321); $6,242,641 as to Andrew Vu (ECF No. 1405); $1,350,340 as to Elham Assadi (ECF No. 1313-1); $316,744.70 as to Leonard Bernot (ECF No. 1328); $309,157.51 as to Xochitl Sandoval (ECF Nos. 1269, 1273); $0 as to Sarah Mattson (ECF Nos. 1366, 1374); $1,465,722.59 as to Omar Sandoval (ECF No. 1515); and $4,867,189.72 as to Domonic McCarns (restitution ordered in related Head II conspiracy, Case No. 2:08-cr-116 (E.D. Cal.), ECF Nos. 829, 835).

4

scheme, rather than tangentially linked[,]" *id.* at 1292 (citation and quotation marks omitted), or harm that is "reasonably foreseeable," *United States v. Lotze*, 192 F. App'x 598, 600-01 (9th Cir. 2006).

When, as here, a dispute arises as to the proper restitution amount, the court must resolve the dispute by explaining its reasoning, supported by the record. *See United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008). In resolving any dispute regarding the amount of restitution, the court applies the preponderance of the evidence standard. *Id.* (citing 18 U.S.C. § 3664(e)). The government has the burden to prove who the victims are and how much loss is reasonably recoverable as a result of the offense. 18 U.S.C. § 3664(e).

III. DISCUSSION

Coffman concedes the MVRA governs here, and his plea agreement conclusively establishes his involvement in the conspiracy. He argues the government's sum is grossly disproportionate to his culpability and includes certain losses not attributable to him. As explained below, the court's decision turns on interpretation and application of "reasonable foreseeability," and whether a victim's initial losses occurred while Coffman worked with Mr. Head, and all losses resulted from Coffman's or his coconspirators' activities.

A. Government's Proof as to Equity Losses

The government's restitution request is based on two aspects of homeowner losses: (1) initial equity losses when the targeted homeowners unknowingly signed their title over to the coconspirators; and (2) resale equity losses when the coconspirators later resold the homes to third parties with a net gain.[3] The court has carefully reviewed the exhibits attached to the

---

[3] The victim impact statements, ECF No. 958, include other requests the government's restitution memorandum omits. In calculating its restitution request, the government discounted costs this court has previously rejected and costs the record does not support, so the court need not address every request. *See* Gov't Mem. at 8 n.6, 15 (electing not to renew request for T.R.'s moving expenses and S.T./B.T.'s legal fees considering court's former restitution order regarding defendant Vu denied those requests); *id.* at 12 n.8 (same as to R.C. and B.C.'s claim for $400,000 based on their eviction, forced vehicle sales, 401(k) cash out, and legal fees); *id.* at 21 n.9 (same as to E.S.'s request for reimbursement of monthly payments and loss of her car); *id.* at 23 n.10 (same as to R.W. and J.W.'s claim for $15,000 based on legal fees, private investigator fees and medical expenses); *id.* at 12 (noting victim T.R. requests $140,000, but record supports only $119,015.45).

government's memorandum, which detail initial equity losses occurring from March 2004 to September 2005, the period during which Coffman was admittedly active in the conspiracy. The court finds by a preponderance of the evidence Coffman is vicariously liable for the reasonably foreseeable losses and harm associated with these initial transactions, as identified in the attached Exhibit A, Column A.

The court further finds Coffman vicariously liable for restitution pertaining to certain resale equity losses. That Coffman may not have directly handled each transaction or even been active in the conspiracy when several transactions occurred does not alter this conclusion, for the losses still were reasonably foreseeable. *United States v. Ruiz*, 462 F.3d 1082, 1088 (9th Cir. 2006) (defendant "vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy.") (citation and quotation marks omitted). Restitution may be based on losses "at least one step removed from the offense conduct itself." *United States v. Gamma Tech. Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001). But "any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct." *Id.* "[I]t is clear from our cases that the phrase 'directly resulting' means that the conduct underlying the offense of conviction must have caused a loss for which a court may order restitution, but the loss cannot be too far removed from that conduct." *Id.* (citations omitted).

Several Ninth Circuit cases have outlined when such "one-step removed" losses "directly relate" to the defendant's action such that the restitution award may encompass them. *See, e.g.*, *United States v. Rice*, 38 F.3d 1536, 1542 (9th Cir. 1994) (upholding, in conspiracy and mail fraud case, restitution based on victim's inability to use any inventory of parts defendant supplied because victim could not identify which were defective); *United States v. Koenig*, 952 F.2d 267, 274-75 (9th Cir. 1991) (upholding, in conspiracy to produce and use counterfeit automated teller machine cards, restitution for the cost of reprogramming bank computers after defendants stole ATM account information). Other cases help clarify where such losses are too attenuated. *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999) (reversing restitution order in fraudulent loan application case; finding inaccurate environmental report was an

intervening cause for the erroneous loan issuance that did not directly relate to offense); *United States v. Sablan*, 92 F.3d 865, 870 (9th Cir. 1996) (reversing restitution order as to consequential damages not necessary to repair damage defendant caused); *United States v. Tyler*, 767 F.2d 1350, 1351 (9th Cir. 1985) (rejecting restitution award; finding losses based on depressed market prices "too remote").

Here, the court has reviewed the government's exhibits pertaining to resale transactions. *See* ECF No. 1444, Exs. 6-20, 22, 25-27, 29-31, 35, 44-45, 49-53 (victims H.M., L.V., E.S., H.W./A.W., E.W./L.W., M.M./R.M., R.E./E.E., R.M./K.M., Y.S., T.C./T.C., M.C., J.B., J.W./D.W., T.R., E.F., P.S., R.L./G.L., M.R./D.R., M.S., L.M., T.W., J.B., K.J., S.T./B.T., R.F., D.G., F.H./D.H., R.B./L.B). The record shows Coffman's coconspirators resold 28 homes to third parties, and each equity-stripping transaction led to reasonably foreseeable losses. Each resale, as *Gamma Tech* requires, links back to Coffman: The identified victims succumbed to the scheme during Coffman's admitted involvement, and each resale, which involved the same fraudulent procedures and canned scripts, was performed either by a known coconspirator, a known straw buyer affiliated with the conspiracy, or by Mr. Head's company for whom Coffman worked. *See generally id*. (key documents identifying straw buyers Marissa Page, Laurie Coffman, Adam Coffman, Brendan Parker, Shawn Willis, Eduardo Vanegas, Jason Marshall, Juan Urena, Abraham Urena, Ryan Wiley, Maria Sandoval); *see also* ECF No. 769 at 27-29[4] (Omar Sandoval's trial testimony as to straw buyer identities); ECF No. 809 at 111-12 (Justin Wiley's trial testimony as to straw buyer identities, one of which is Coffman's brother); ECF No. 808 at 58-61 (Emily Silva's testimony identifying straw buyers); ECF No. 807 at 93-130 (Castlehead Escrow dealings with Charles Head operations between 2001 and 2005).

The court finds these losses are supported by a preponderance of the evidence and were sufficiently foreseeable and related to Coffman's criminal conduct. *See Gamma Tech.*, 265 F.3d at 928 (explaining "directly related" the causal nexus between the conduct and the loss cannot be too factually or temporally attenuated) (citation omitted); *see also United States v.*

---

[4] Where the filings contain two page numbers, the court refers to the page numbers electronically assigned by the court's filing system.

7

*Newsome*, 322 F.3d 328, 338, 342 (4th Cir. 2003) (holding co-conspirator responsible for all losses conspiracy caused, not just losses incurred while he was involved, and holding this approach comports with legislative intent to fully compensate victims); *cf. United States v. Rice*, 38 F.3d 1536, 1545 (9th Cir. 1994) (affirming restitution order for losses suffered as a result of bribes made a year after conspiracy ends); *but see United States v. Reed*, 80 F.3d 1419, 1421 (9th Cir. 1996) (reversing restitution order based on collateral damage to private cars during high speed police chase; finding damage unrelated to offense of felon possessing a firearm). Subject to slight adjustments explained below, the court awards restitution based on both the initial equity losses and resale equity losses, with the resale equity losses shown in Exhibit A, Column B.[5]

        B.      <u>Coffman's Specific Objections</u>

Coffman lodged blanket objections to the amounts and calculations described above based on the position that those losses were not foreseeable. *See generally* Coffman Br. The court overrules these objections. Coffman also specifically objects to the government's request as to six transactions in which he was personally involved and the total amount. Reply Br. at 5. He contends (1) as to three victims, their impact statements do not support the government's sum; (2) he is entitled to credits based on money he returned to some victims; and (3) the requested sum exceeds the high end of the plea agreement's loss estimate and is so high he cannot pay it. *See* Coffman Br. at 3-5; Reply Br. at 3 n.3, 5-6.

                1.      <u>Victim Impact Statements</u>

Coffman contends two homeowners, J.B. and T.C., submitted no restitution claim, and that one, L.A., claimed less than what the government now seeks. Having examined 811 pages of victim statements, the court agrees not one pertains to T.C. (or her husband, who also has the initials T.C.) or J.B. ECF No. 958 (seven attachments, 605 pages); ECF No. 894-2 (one attachment, 206 pages). Additionally, at sentencing, Coffman submitted a statement from T.C. in which she declares she experienced no losses attributable to Coffman and, in fact, states Coffman was always truthful with her. *See* ECF No. 1047-1 (T.C.'s statement).

---

[5] As corrected in the attached table, the government miscalculated its requested totals as to T.R., H.W., and A.W., which partially explains the court's reduced award.

Victim impact statements or victim affidavits are highly relevant in fashioning an appropriate restitution award. *Waknine*, 543 F.3d at 557 (explaining victim affidavits will generally provide sufficient, reliable evidence to support a restitution order). By extension, a victim's affirmative renunciation of any loss, although not dispositive, increases the government's burden to prove that person is a restitution victim, *United States v. Baker*, 25 F.3d 1452, 1455 (9th Cir. 1994), and to prove her loss amount, 18 U.S.C. § 3664(e).

Here, the court finds the record insufficient to award restitution to T.C./T.C. Although the court awarded restitution to T.C./T.C. in a prior restitution order against defendant Vu based on the record in his case, ECF No. 1405-1, the court declines to do so here on the current record. T.C., presumably speaking for the couple, has disclaimed any injury attributable specifically to Coffman, and the government has neither rebutted this showing nor attached a contrary victim impact statement. The government has not shown by a preponderance of the evidence that Coffman owes T.C./T.C. $162,179.36 in restitution. This amount is subtracted from the amount of restitution ordered, as shown in Exhibit A, Column D.

The same conclusion does not hold true for J.B., as he never affirmatively disclaimed his loss, but rather did not submit a statement. *See generally* ECF No. 958. The government has offered documents illustrating J.B.'s loss, *see* Ex. 13, ECF No. 1444 -7; nothing in the record contradicts that calculation. The government explains, with supporting documentation, that J.B. lost his home in Carson, California; Coffman's brother was the straw buyer, Ex. 13-1; and Coffman was the sales agent who had J.B. sign over his property, and was listed on internal documents maintained by coconspirator Kou Yang, Ex. 13-2. The government also has filed documentation showing Castlehead Escrow was used to process the payment, which stripped out $80,697.40 from the equity to which J.B. would have been entitled. Ex. 13 at 3-4. Castlehead wired those funds to Matrixx Investment Group, a shell company Coffman controlled, on September 3, 2004. Ex. 13-5. The government further has established that coconspirators removed another $180,000 in equity by reselling the property to J.B.'s mother-in-law in March 2006. Ex. 13 at 6-8. The government has met its burden to show J.B. is entitled to $260,697.40

in restitution. *See* Gov't Mem. at 9. Coffman has not rebutted the government's evidence nor refuted its accuracy or reliability. Coffman is liable to J.B. for $260,697.40 in restitution.

Lastly, Coffman contends L.A.'s restitution should be limited to the $150,000 he asked for in his victim impact statement, not the $246.319.71 the government now pursues. Coffman Br. at 5. The court agrees. Although the government has shown L.A. suffered some loss, it has not supported its requested figure. *See* Gov't Mem. at 23; Ex. 59, ECF No. 1444-16. The government's exhibits show L.A. lost his home in Oakland, California, and that Liz Huerta and James Russell were the straw buyers. Ex. 59 at 1-2. Coffman was the person who pitched the Head scheme to L.A. and assured L.A. he would remain on title. Ex. 59 at 4-5. In September 2005, Castlehead Escrow wired the funds to Matrixx Investment. Ex. 59-3. Although this evidence ties Coffman to victim L.A., and shows $246,319.71 was transferred between accounts, the government has not explained how, in light of L.A.'s expressed $150,000 loss cap, the loss can so greatly exceed this self-reported sum. *See* ECF No. 958-5 at 12-13 (victim impact statement). The court GRANTS the government's request to award L.A. restitution, but LIMITS that sum to $150,000 by subtracting $96,319.71, as reflected in Exhibit A, Column D.

In sum, the court reduces the government's requested award by subtracting $162,179.36 (the loss the government attributes to T.C./T.C.) because the record contradicts this figure, and $96,319.71, the difference between the loss the government says L.A. suffered ($260,697.40) and the loss L.A. says he suffered ($150,000).

2. Coffman's Claimed Credits

Coffman next argues he is entitled to certain credits and offsets based on equity he allegedly split with three homeowners after discovery of his offense. *See* Coffman Br. at 5 (citing $10,000 equity "split" with T.G. and S.G.; $25,000 equity "split" with R.M. and K.M.; and $20,000 equity "split" with M.R. and D.R.).

The court has discretion to assign burdens with respect to credits or offsets in fashioning a restitution order as justice requires. 18 U.S.C. § 3664 ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."). For Coffman to benefit from a credit or offset, the

10

court finds the burden lies with Coffman. Here, Coffman has not met his burden. He cites no authority entitling him to the cited credits, and the court is not persuaded he is so entitled. *Cf. United States v. Bright*, 353 F.3d 1114, 1119 (9th Cir. 2004) ("[R]efunds paid voluntarily by a defendant after discovery of the offense cannot be credited against total loss.").

Even if Coffman were entitled to credits, he has attached no financial documents or any other evidence to establish them. *See generally* Coffman Br.; Coffman Reply. His only citations are to pages of discovery he says documents three victims' telling investigators about the credits, but he does not attach, quote or otherwise assist the court in demonstrating these statements were made. *Id.* at 5 (citing "CHEAD1, p. 1380," "CHEAD1, p. 1318" and "CHEAD1, p. 1326," with no docket location). He includes no dates showing when the equity was allegedly split, or when the victims allegedly told the investigators about the split, as needed for the court to cross-reference those dates against the government's proof and the victims' impact statements. Coffman also has not otherwise rebutted the figures contained in the government's exhibits pertaining to the relevant losses: T.G. and S.G's loss, Ex. 36, ECF No. 1444-12; R.M. and K.M.'s loss, Ex. 38, ECF No. 144-12; and M.R. and D.R.'s loss, Ex. 17, ECF No. 1444-8. The exhibits, which include the initial transfer, sale and equity documents, do not reflect the equity Coffman allegedly split with these victims. Nor has Coffman rebutted the victim impact statements, filed in July 2014, which reflect no such shared costs. *See, e.g.*, ECF No. 958-1 at 69 (T.G. and S.G's impact statement); *id.* at 123-24 (R.M. and K.M.'s impact statement). The court DENIES Coffman's request to reduce restitution based on claimed credits that are uncorroborated.

### 3. Ability to Pay

In a footnote, Coffman alludes to his inability to pay the requested restitution sum as a reason to lessen the award, but cites no authority to support the assertion. *See* Reply at 2 n.1. But the MVRA provides a "court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The defendant's economic circumstances factor only in fashioning the restitution payment schedule. *Bright*, 353 F.3d at 1122 (citing § 3664(f)(2)). In crafting the payment schedule, the court need only find "some

evidence" defendant might be able to make the required restitution payments. *United States v. Ramilo*, 986 F.2d 333, 335 (9th Cir. 1993).

Here, Coffman contends "[i]t is extremely unlikely [he] will ever be able to pay anywhere near that amount in his lifetime, even with well-paid, full-time employment," and characterizes such "extreme figures" as "counter-productive" and "futile." Reply Br. at 2 n.1. In the same breath, he notes that immediately before prison he had a well-paid, full-time job as an "Assistant General Manager at the Star Restaurant Group, making about $72,000 per year." *Id.* This alone is "some evidence" of his ability to pay. Although his PSR reflects a negative net worth, it shows that at the time of sentencing, Coffman was single with no dependents and had a $3,000 net monthly income. Coffman PSR at 11, 13-14. Based on this information, the court finds Coffman is likely able to make modest restitution payments jointly and severally with his codefendants. In any event, as the court has noted previously in restitution orders in this case, the court's job in resolving the parties' dispute regarding restitution does not involve determining whether blood can be squeezed from a turnip. Coffman's misgivings as to his ability to ever pay the total sum are not relevant to the court's conclusion.

### 4. Plea Agreement Estimate

Coffman also argues that the government has breached the plea agreement by requesting a sum beyond the contemplated range. Coffman Reply at 3 n.3. With the adjustments discussed above, and as reflected in Exhibit A, the restitution amount stands at $7,364,387.04, which slightly exceeds the $2.5 to $7 million estimated loss range in Coffman's plea agreement. Plea Agmt. at 9 ("the loss attributable to the defendant was more than $2.5 million, but less than $7 million, including the foreseeable acts of coconspirators during the time period that defendant was a participant in the scheme.").

Courts may not order restitution beyond the actual loss sustained by victims. *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015); s*ee also United States v. Griffith*, 584 F.3d 1004, 1019 (10th Cir. 2009) ("a district court that orders restitution in an amount greater than the total loss caused by the offense thereby exceeds its statutory jurisdiction and imposes an illegal sentence") (internal quotation marks omitted). "But the MVRA does not require

restitution to match the loss figure used for sentencing. Indeed, the amounts of loss and restitution can and do differ." *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) (citation omitted); *see also* Robert W. Haines, Jr., et al., *Federal Sentencing Guidelines Handbook*, at 1556-57 (2015-16 ed.). At sentencing, courts do not make express factual findings as to actual loss; in determining restitution, as shown above, courts are required to and do make such findings. *See United States v. Bazemore*, 839 F.3d 379, 388 (5th Cir. 2016); *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) (explaining, at sentencing, the "court need only make a reasonable estimate of the loss, given the available information.").

Here, the government has detailed the fraudulent home purchases effected while Coffman was part of the scheme, each of which is verified by financial and property records. The court finds by a preponderance of the evidence that $7,364,387.04 is an accurate assessment of the victims' reasonable and foreseeable losses attributable to Coffman. That this sum does not fall within the loss range estimate in his plea agreement does not change this conclusion. *Patterson*, 595 F.3d at 1327. The plea agreement's carefully chosen words characterize the restitution range as just that, an "estimate." Plea Agmt. at 3. By proving and requesting restitution that matches the now detailed, verifiable losses, the government has not breached the plea agreement "estimate." As part of his criminal sentence, Coffman agreed to pay "the full amount of restitution to all victims affected by his offense, including but not limited to, the victims covered in the factual basis and other victims as a result of the defendant's conduct[.]" Plea Agmt. at 2-3. This order now determines the full amount owed.

IV. CONCLUSION

The court AWARDS $7,364,387.04 in restitution, with identified victims paid the individual amounts shown in Exhibit A, Column E.

The government is directed to file, within fourteen days, copies of the pages of the following sealed documents upon which the court has relied, redacting all personal identifying information: T.G./S.G impact statement, ECF No. 958-1 at 69; and R.M./K.M. impact statement, ECF No. 958-1 at 123-24.

The Clerk of the Court is directed to issue an amended judgment reflecting this order, with Coffman paying restitution jointly and severally with all other codefendants convicted and sentenced in this case.

IT IS SO ORDERED.

This order resolves ECF No. 1444.

DATED: October 30, 2017.

_____
UNITED STATES DISTRICT JUDGE